THE PEOPLE OF PUERTO RICO, Plaintiff and Appellee, v. PEDRO ELPIDIO MADRIGAL, Defendant and Appellant.

Nos. CR-66-254, CR-66-255. Decided January 24, 1967.

*E. Armstrong de Watlington* and *Edna Abruña Rodríguez* for appellant. *J. F. Rodríguez Rivera, Acting Solicitor General,* for The People.

Mr. Justice Pérez Pimentel delivered the opinion of the Court.

The prosecuting attorney accused appellant of the offense of murder in the first degree, consisting in that on July 31, 1965 and in San Juan, "illegally, wilfully and with malice aforethought with the firm intent to kill, showing a perverted and malignant heart, he criminally and treacherously assaulted Rafael Valentín Piñeiro Quiñones, a human being, with a knife, inflicting a serious wound which caused his death that same day." He was also charged with a violation of § 4 of the Weapons Law.

A jury found him guilty of murder in the second degree and he was sentenced to an indeterminate penalty of from 12 to 25 years of imprisonment in the penitentiary at hard labor. The court convicted him for violation of § 4 of the Weapons Law and sentenced him to two years' imprisonment in jail.

He assigns as first error that the penalty imposed for the violation of § 4 of the Weapons Law is excessive.

He is right and it is so recognized by the Solicitor General. Section 40 of the Weapons Law (25 L.P.R.A. § 450) provides that any person convicted for any of the misdemeanors defined in § 4 (§ 414 of the same L.P.R.A title) shall be punished by imprisonment in jail for a term of not less than six (6) months nor more than one (1) year. And § 4, after mentioning the weapons prohibited provides "and any person who uses against another any of the weapons above named in this section, shall be guilty of a misdemeanor and if previously convicted of any violation of this Act, or of any of the offenses listed in Section 17(b) hereof, shall be guilty of felony."

■ Appellant was convicted on one of the misdemeanors defined in § 4 (carrying a knife) and it was neither alleged nor proved that defendant had been convicted previously for any violation of Chapter 51 (Weapons Law). Therefore, the maximum penalty for the offense committed by appellant is one (1) year imprisonment in jail. As a result the sentence appealed from reducing the penalty to 1 year in jail will be modified, and as modified, affirmed.

The second error attacks the sufficiency of the evidence of The People to support the verdict of the jury in declaring defendant guilty of murder in the second degree.

The evidence of The People is circumstantial. No witness testified having seen defendant inflict the mortal wound to the victim. The prosecuting attorney introduced the testimonies of six witnesses first and of another afterwards, as rebuttal evidence. Appellant used only his own testimony to establish his defense. We shall now summarize the evidence.

*Carmen Leonor Guerrido* testified, in synthesis, that about three thirty in the morning of the day of the occurrence she left the Sea Club to go to La Riviera. These are two public establishments in the waterfront area of San Juan; that while she was waiting for a young man on the stairs of La Riviera, three men arrived there, one of which asked her if she wanted to go out with somebody known as El Capitán, and she refused. She gave the same answer to appellant when the latter asked her the same question; that appellant touched the witness' breasts and hips, whereupon she told the group that if they continued pawing her she was going to hit them with the heel of her shoes; to this appellant responded that "if I hit his friend, he would stab me four times"; that afterwards she walked to a drainpipe nearby, called a fellow nicknamed Guare and asked him to accompany her because she was leaving, but Guare refused; the fellows who were talking to him "brought me here and I didn't know anything else"; that she did not see either a

knife or a poniard and she knows nothing about Valentín Piñeiro's death.

*Dr. Pedro Díaz Gándara*: He testified, in synthesis, that he performed the autopsy on the corpse of Valentín Piñeiro Quiñones on July 31, 1965 at four thirty in the afternoon. After describing the wounds on the deceased man's body, among them a penetrating incised wound on the back, he describes the cause of death as follows: "The blade used penetrates the body from the back to the front, from left to right, and from top downward, in an approximate 121-degree angle with the main axis of the body, upon penetrating the blade perforates the skin, the flesh; the weapon perforates the skin, the cellular subcutaneous muscular tissue of the left inframuscular region, penetrates the thoracic cavity from its posterior region through the active intercostal space, perforates the pleura, the left lung, and lacerates the vena cava inferior, producing a massive internal hemorrhage, causing massive internal hemorrhage. The toxicological analysis of the blood in this case reveals a concentration of 0.13 percent of alcohol, by weight. And the cause of death is a penetrating wound in the thorax." (Tr. Ev. pp. 21, 22.)

*William Benítez Navarro* testified, in synthesis, that at the time of the occurrence in the early morning hours he was at the Antilles Club, from where he went to La Riviera Club; that he witnessed an argument between Carmen Leonor Guerrido and appellant, who was accompanied by two other persons; that he heard appellant tell the Guerrido woman "if you hit my friend with the heel I am going to stab you four times"; that he saw when an argument originated between a friend of appellant's and another person; that the group accompanying appellant moved to the gate of pier number seven, from where they started to throw stones towards La Riviera Club; that the group which remained on La Riviera side, who were his friends, started to throw stones also; that the group by the pier were not his friends

but worked on the vessels; that this group continued to increase until they were ten; that afterwards he saw when defendant-appellant ran after a person known as Guare, who turned out to be Alfredo Vergara Santos; that he saw appellant again in front of the Limbo when the son of the one we call Capataz came out shouting "not to him, that's my father" and then appellant let him go by; that when appellant got close to the witness the latter saw "a shiny object in his hand, that I don't say it was a knife or a weapon." Afterwards, the witness went with some other persons to the pier and "started to throw stones at those on the vessel"; that he had been hit by a stone and had received a wound on the head and had blood on his shirt and that as somebody had shouted "the police," for fear of being arrested he hid and heard nothing more of what happened; that he didn't know Valentín Piñeiro Quiñones personally, but had seen him that night and had spoken to him near La Riviera; that later the witness went to see him at his house when he was told that he was dead; that he did not see the defendant with a knife or see him kill Valentín Piñeiro.

*Ana Luisa Jerés* testified, in synthesis, that on the date of the occurrence she worked as cashier in the Limbo Club, a business across from pier number seven; that while she was at the establishment "the murdered" person came in and asked for a beer, that she registered the fifty cents in the cash register and served him; that then two Americans came in; that at the same time the Americans entered, a man named Andrés García Guzmán, who speaks with a Dominican accent, came in shouting and pounding hard on the bar asking her to telephone the police; that she told him to calm down because nothing had happened there; that then García Guzmán lifted a chair high in the air, somebody intervened and García Guzmán "put down the chair and left rapidly." That the person she afterwards found out was dead had remained seated there while she went to serve two "Rum and

Coke" to the Americans; that she first saw defendant when she was taken before the prosecuting attorney; that she found out that the deceased was not there.

*Alfredo Vergara Santos* testified, in synthesis, that around three thirty in the morning of July 31, 1965 he was at La Riviera Bar, located across from pier number seven; that he walked down to the sidewalk and saw a group of people in front of El Limbo throwing stones toward pier 7 and those on the pier threw back to El Limbo that he squatted; that he was hit with a stone "and with the same stone I started to throw towards the pier"; that at that time the throwing of stones ceased "and those throwing from the pier went inside the gate, towards the pier; then we went back again"; that the ones from the pier started throwing stones again, then they calmed down and the witness went to El Limbo, where an argument was going on among three persons, the bar girl, Valentín Piñeiro, and another man whose name he does not know. On cross-examination he says that that other man was Andrés Martínez. The witness continues to testify that he went outside and told somebody who was with Andrés Martínez, to take him away so that nothing would happen "and he came and took him away"; that upon taking him away they both went to pier seven and the stone-throwing started again; that then the stone-throwing ceased, the witness reached into his pocket and told defendant that if he would throw stones "he was going to fire a shot at him, to scare him" because he was the one who started the stone-throwing; "that at that moment the witness did not have any weapon with him; that defendant stepped forward and came out with a knife in his hand, about eight inches long, more or less, with white blade; that defendant ran after me and the one who was beside me . . ."; that the witness ran towards El Limbo and went past the Limbo's door; that he stopped and looked back to see the distance he was from

defendant and saw Valentín Piñeiro coming out of the Limbo. The witness continues to testify as follows:

"In what direction does Valentín Piñeiro leave?
    As if going to San Juan.
"And when he leaves as if walking towards San Juan, what happened, if anything, that you saw?
    Well, when he turns the corner the man chases him, accompanied by another.
"When you say 'the man' do you mean the defendant?
    Yes, sir. He and another one in front, he was carrying a stick and another one without anything behind him.
"Two persons chase him, one with a stick, and you said that you didn't see he had anything?
    And he was in front.
"And Pedro Elpidio Madrigal, did he have anything?
    A knife.
"The knife you described for us?
    Yes, sir. When I reached the corner to see what's happening, other people came from behind the pier and I went back and forgot about the matter because I did not have time to  . . .
"Going in the direction you have mentioned, towards San Juan, which place or store, if any, is there that you recall?
    A store which sells tires and things for cars, which they call Firestone.
"Then you say that in that direction, towards San Juan, Valentín is running followed by Pedro Elpidio Madrigal with a stick and another one who is empty-handed?
    Yes, sir.
"And that then, you say, when you went to find out they threw stones at you and you return and don't find out what's happening there?
    Yes, sir. I don't know what's going on." (Tr. Ev. 78–80.)

The witness continues to testify that after that "I take William's car because he is not around there because he has to see a girl and I drove around in the car and I waited and he gave me a lift to the place where I slept and I didn't know anything until next day when the detectives went around

and asked and so forth. We told them what had happened and they took us to the police station and so forth." He also testified that he did not see the defendant kill Valentín Piñeiro; that he was there until five-thirty in the morning; that he was there when the police arrived but he had not heard that somebody was dead; that the deceased appeared in front of the Firestone store. He further stated that he (the witness) has been convicted of a felony, for drugs.

*José L. Batista* testifies, in synthesis, that he is a state policeman and that on the date of the occurrence he was on duty to patrol San Juan; that about five to four in the morning he received a message and went to the Firestone store on Pier Street, corner of Fernández Juncos; that on that corner, "on the sidewalk of the Firestone store, about twenty feet to the left of the front showcase, there was a man lying on the sidewalk facedown, who showed a wound on the left side of his body"; that that person was Valentín Piñeiro Quiñones; that in that section there are several bars and night clubs, among them El Limbo and La Riviera; that he did not find any steel weapon in the surrounding area; that he did not see anybody when he arrived, felt the wounded man's pulse, felt he had a pulse, put him on the patrol wagon and took him to the Santurce Municipal Hospital.

We have already stated that the only witness for the defense was the testimony of defendant himself, Pedro Elpidio Madrigal. He testified, in synthesis, that he lives in the Dominican Republic and works as merchant marine on board the vessel Loyda; that on the night of the occurrence he was visiting an uncle of his and that on his way back to the vessel he stopped off at La Riviera Club to buy cigarettes; that when he left the business he saw some sort of a "brawl" and heard somebody say "look, there goes a Dominican, throw at him also"; that while he walked towards the vessel they started to throw stones at him and that when

he tried to get some stones to hurl them back, the group behind him was too large. Afterwards he went to the vessel to which they chased him and once inside he did not come out again. The witness denied Carmen Guerrido's testimony, as well as a series of circumstances brought by the prosecuting attorney's evidence. He admitted that he was the vessel's cook and that he handled knives. He stated also that when the police went for him at the vessel, he took his work shirt with him; that there is only one knife on board, which is from 14 to 16 inches long, including the handle. He said that when he was taken to the prosecuting attorney he was able to convince the police to take him to the vessel to talk to the Captain; that after he talked to the Captain, the white policeman walked in and said "wait a minute and opens the door and does like this, 'come on Captain,' and both leave talking, get the knife you have in there in the vessel." The witness continues to answer:

"Judge:

To whom did he say that?

The policeman to the Captain. 'Let me see the knife you have in the vessel' and the Captain said, 'there's only one in use here' and said 'let me see it because that is what I wanted, to get the evidence against the bandit, the criminal,' that was what the policeman said, and they took me to the police station immediately.

Mr. Velázquez:

Who took the knife?

The police took it over there, to La Princesa and there he stared at it, a dark knife with a dark blade.

And what about the knife and the shirt?

The police took them.

And why hasn't the prosecuting attorney introduced them here, where are they?

They have it hidden, the policeman was going to wash the shirt to send it there, it was my working shirt.

That is all, Judge, that's all the evidence." (Tr. Ev. 202-203.)

Detective Jesús M. Pagán, as rebuttal evidence for the prosecuting attorney, testified that when he investigated the defendant on the night of July 31, 1965, the defendant did not say he had been to La Riviera, or that he had heard an argument and somebody yell that there goes another of the Dominicans or that stones were thrown at him and that he also threw stones, having gone to sleep after that.

■ Having considered the evidence of The People as a whole, if believed by the trier, it is sufficient to sustain the conclusion that it was appellant who inflicted the mortal wound to the deceased and as a result that the verdict of guilty is supported by said evidence. The error was not committed.

In the third assignment of error appellant complains that (1) the prosecuting attorney was allowed, over his objection, to interpret the law in his argument to the jury, and (2) he had also been allowed to argue in his statement to the jury and make reference to evidence neither presented nor admitted during the trial.

In his closing argument the prosecuting attorney referred to the presumption of credibility accompanying every witness and argued that such presumption was applied to the defendant because of the manner in which he had testified and his conduct on the witness stand. The prosecuting attorney also referred in that argument to the reasonable doubt and stated that that was not a capricious doubt, but that it had to be based on the evidence.

■ We are of the opinion that the references to the law made by the prosecuting attorney in his argument are not of such nature that they have prejudiced appellant's substantial rights. The judge's instructions to the jury were correct regarding both points and they do not differ from the statements made by the prosecuting attorney. The references to the law made by the prosecuting attorney in his

argument do not constitute grounds for reversal, unless they prejudice defendant's substantial rights. 67 A.L.R.2d 245; 5 Wharton, Criminal Law and Procedure 253, § 2089.

■ But we do agree with appellant in that in his rebuttal argument to the jury the prosecuting attorney brought to the knowledge of its members elements which were not supported by the evidence, which conduct was prejudicial to defendant's rights. Let us see what happened.

On the witness stand appellant testified that the following afternoon, when the police went to arrest him they took along a shirt belonging to him and a knife used in the vessel's kitchen. To his lawyer's questions he answered:

"Mr. Velázquez:

Who took the knife?

The police took it over there, to La Princesa and there he stared at it, a dark knife with a dark blade.

And what about the knife and the shirt?

The police took them.

And why hasn't the prosecuting attorney introduced them here, where are they?

They have it hidden, the policeman was going to wash the shirt to send it there, it was my working shirt."

The prosecuting attorney told the jury:

"It is not that some other suspect or person intervened, he appears almost immediately when policeman Carmelo Batista arrives; there is the man facing down with a blow here and a steel weapon wound on his back. The fact that the police didn't bring the weapon to you, in the first place, I don't believe the weapon used was the one in the vessel's kitchen because one is not going to keep a weapon after using it, one is not going to keep the weapon and put it away, one throws it away. And the shirt, what does a person do first? evidence which you have here that, as the pathologist stated, it was an internal hemorrhage, an internal hemorrhage.

"Mr. Velázquez:

"We want to raise an objection now, not because we are at all afraid, but because that's not the procedure. We want it to

appear in the record that the prosecuting attorney is testifying and that he did not have opportunity to bring the shirt or to bring evidence from the police, where is that shirt? and he did not bring it even though he brought rebuttal evidence and, nevertheless, now he is, practically taking the witness stand to give an explanation. I appreciate and respect my colleague so much that his testimony must cause terrible damage to the defendant. I am among those who appreciate and respect him, I know the testimony is terrible. If he takes the witness stand and he did not testify, neither did the policeman, he does not have a right to refer to this testimony in his argument now.

"Judge:

"Go on, prosecuting attorney. Record the colleague's exception.

"Prosecuting attorney:

I am talking to you about the shirt, in the first place, there is no evidence that when this man was stabbed blood spurt out covering the defendant. Such evidence is not here. That evidence you have from the pathologist as to the fact that it was an internal hemorrhage, a massive and internal hemorrhage. It is not a question of when a person is cut here and the spurt of blood covers the person beside him and splashes the walls. The evidence you have here is that the wound was from the back and that the vena cava is affected, that is about eight inches deep, according to the pathologist, not that the blood flows immediately. Second, that somebody commits a crime and a drop of blood falls on him and he washes the shirt. When the police go to get him the next day, a trace of blood would be insufficient to determine whether it is human blood, that calls for a chemical analysis, not as our colleague says. With a small spot like this you can tell which kind of blood, a blood sample is necessary, especially for performing those analyses. And besides, he had the opportunity to continue, he requested another witness, of asking for that one . . . if he didn't find out from the defendant, well, ask that the shirt be brought to him. He also had that and I didn't keep it from him and there it is, he could have asked the police for it, but if I bring you that shirt, it is natural that if there is no result, well, that I don't bring it because it does not prove anything if there is no result. The weapon, as far as the weapon is concerned, forget about it, if a fellow commits a

854

murder with a knife he is not going to keep it in his hands, he throws it in the water right there at pier 7, look for it, the only knife we have here is the one from the kitchen, look for it. Remember that he was not arrested immediately, that he had time to dispose of the weapon. The weapon, where is it? I asked him. I don't know where it is, that's the truth." (Argument of Rebuttal, pp. 8–10.)

The first reason the prosecuting attorney gave for not presenting the shirt in evidence was that due to the nature of the wound the blood does not flow immediately and that there was no evidence that there was a spurt of blood which covered the defendant.

The truth is that regarding such explanation on the part of the prosecuting attorney no evidence was introduced in spite of the fact that The People used the testimony of the physician who performed the autopsy on the deceased.

The second reason was that when somebody commits a crime and a drop of blood falls on his shirt, he washes the shirt and when the police go to look for him if a trace of blood is left it would be insufficient to determine whether it is human blood.

As a third reason the prosecuting attorney stated that the defendant had the opportunity of asking for the shirt and then added ". . . but if I bring you that shirt, it is natural that if there is no result, well, that I don't bring it because it does not prove anything if there is no result."

All these statements of the prosecuting attorney about facts which do not appear in the evidence are serious indeed, especially in a case like this. The prosecuting attorney had the shirt and with his statements led the jury to the belief that the shirt could have been washed by the defendant, and what is even more prejudicial, that as a result of the shirt having been washed, it could have had a "speck" of blood and that this "speck" of blood was insufficient to determine whether it was human blood. If the shirt seized from

defendant had blood. that was a link which connected him strongly with the commission of the offense, inasmuch as no witness testified having seen defendant stab the deceased. There is in the evidence only a series of facts and circumstances and indications which point to him, by inference, as the one who committed the crime. The reference to defendant's shirt made by the prosecuting attorney in his argument and the explanations he gave for not introducing it in evidence, added more and stronger indications which are not in the evidence, which pointed to defendant as guilty of the offense charged.

In another part of his argument the prosecuting attorney said:

"Which one of the persons there had the knife and who was chasing the deceased? and you and I arrive at the conclusion that, well . . . the only one who was running with a knife moments before Valentín Piñeiro's corpse was found is this defendant. That he is the only one seen with a steel weapon in his hand and the death was caused by a steel weapon and he appears right there minutes later and almost pulseless. It is obvious that a person who has a stab wound or with a steel weapon, whichever it is, like that, on the back, cannot continue to walk much longer, no, he must fall down. And after he falls life begins to ebb out because the heart continues to beat and only pumps the blood that is flowing out. The heart beats and bleeds with less strength because there is less vitality in the body, it is being lost, the person takes time in dying, but dies." (Argument of Rebuttal, p. 11.)

Even though as we have already seen, the physician who performed the autopsy on the deceased testified at the trial, he was not asked, nor the prosecuting attorney produced another expert to show, whether a person who receives a wound like that the deceased showed cannot "walk much" and has to fall down. These affirmations and those which follow the prosecuting attorney's argument are proper of expert testimony but the prosecuting attorney shall not turn

into an expert to offer the jury evidence alien to_ the record.

It is a known doctrine here and in almost all American jurisdictions that no argument is legal if it makes reference to evidence which was not admitted during the trial. In this case the judge did not try to protect defendant's rights by giving the necessary instructions at the right moment and the error undoubtedly damaged the substantial rights of defendant. *People* v. *Orona Merced*, 89 P.R.R. 329 (1963); *People* v. *Fournier*, 80 P.R.R. 376, 394 (1948); *People* v. *Ruiz*, 79 P.R.R. 902 (1957); *People* v. *Marchand*, 53 P.R.R. 640, 642 (1938); 88 C.J.S. § 181; 53 Am. Jur. § 483; 5 Wharton, Criminal Law and Procedure, § 2082.

By virtue thereof, the judgment appealed from will be reversed and a new trial ordered.